**Louis Vuitton MALLETIER and Oakley, Inc., Plaintiffs,**

v.

**Christopher VEIT and Hena Hasan a/k/a Hena Veit, et al., Defendants.**

**No. Civ.A. 01–3991.**

United States District Court, E.D. Pennsylvania.

June 26, 2002.

Judgement Amended June 28, 2002.

M. Kelly Tillery, Leonard, Tillery & Sciolla, Philadelphia, PA, Matthew W. Carlin, Ronald E. Coleman, Gibney, Anthony & Flaherty, LLP, New York City, for Plaintiffs.

## MEMORANDUM INCLUDING FINDINGS OF FACT, CONCLUSIONS OF LAW, DEFAULT JUDGMENT, DAMAGE ASSESSMENT, and PERMANENT INJUNCTION

LOWELL A. REED, Jr., Senior District Judge.

Plaintiffs Louis Vuitton Malletier and Oakley, Inc. brought this suit against Defendants Christopher Veit, Hena Hasan a/k/a Hena Veit, individually and d/b/a Watch Replica, *watchreplica.com*, and *replicatime.com*; Swiss Click, Inc.; and Michael Kelvin a/k/a Richard Jones, Individually and d/b/a Netgifts and Net Gifts, Inc., and have charged the Defendants with federal trademark counterfeiting under the Lanham Act, 15 U.S.C. § 1114 (Count 1), federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count 2), federal unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count 3), federal trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c) (Count 4), cybersquatting under the Federal Anti–Cybersquatting Act, 15 U.S.C. § 1125(d) (Count 5), trademark dilution under Pennsylvania statutory law, 54 Pa.C.S. § 1124 (Count 6), and unfair competition under Pennsylvania common law (Count 7), based upon the sale of counterfeit goods bearing the federally registered trademarks of the Plaintiffs. A default was entered against Defendants on September 17, 2001.

Presently before this Court is the motion of Plaintiffs for default judgment, including money damages, and a permanent injunction, (Document No. 9), pursuant to Rule 55(b) of the Federal Rules of Civil Procedure. By Orders dated April 25, 2002 (Document No. 13), and April 29, 2002, (Document No. 14) this Court scheduled an evidentiary hearing, ordered the Plaintiffs to be prepared to present factual proof of service, as well as factual proof that the Plaintiffs had made reasonable efforts to serve a copy of each April Order upon the Defendants personally. This Court conducted the evidentiary hearing on June 5, 2002, and because the Defendants had failed to answer the complaint, pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, all averments to which a response is required, were accepted into

evidence. Based upon the pleadings, the exhibits, the affidavits and memorandum of law in support thereof, as well as the arguments of counsel, this Court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[1]

1. Plaintiff Louis Vuitton Malletier is a *societe anonyme* duly organized and existing under the laws of France, having an office and principal place of business in at 2 rue du Pont Neuf, Paris cedex 01, 75354, France. (Comp. ¶ 6.)

2. Louis Vuitton is the exclusive distributor of Louis Vuitton products, all of which bear one or more of Louis Vuitton's registered trademarks. (Comp. ¶ 24.)

3. Louis Vuitton owns, among others, the trademarks and trade names "LV," "LOUIS VUITTON," Monogram Canvas Pattern Design and Epi trademarks. (Comp. ¶ 25.)

4. Commencing at least as early as 1932, Louis Vuitton registered its trademarks in the United States Patent and Trademark Office. At present, Louis Vuitton's U.S. trademark registrations include, *inter alia:* LV (Interlocked Letters) in a Circle Design (Reg. No. 286,345), LV (Interlocked Letters) and Monogram Canvas Design (Reg. No. 297,594), LOUIS VUITTON (Reg. No. 1,045,932), LV (Interlocked Letters) Design (Reg. No. 1,519,-828), L'ANE DU VOYAGE (Reg. No. 1,574,197), LOUIS VUITTON MALLETIER A PARIS in Rectangle Design (Reg. No. 1,615,681), Noe Style Handbag Design with LV (Interlocked Letters) and Monogram Canvas Design (Reg. No. 1,643,625), LV (Interlocked Letters) on Half Epi Leather Design (Reg. No. 1,646,847), LV (Interlocked Letters) LOUIS VUITTON Brass Lock Design (Reg. No. 1,650,162), LV (Interlocked Letters) on Criss–Cross Background Design (Reg. No. 1,653,662), Keepall Style Duffel Bag Design with LV (Interlocked Letters) and Monogram Canvas Design (Reg. No. 1,653,663), LV (Interlocked Letters) on Epi Leather Design (Reg. No. 1,655,564), Monogram Canvas Design (Reg. No. 1,841,850), LV (Interlocked Letters) CUP with Flag Design (Reg. No. 1,902,728), TAIGA (Reg. No. 1,923,652), Epi Leather Design (Reg. No. 1,931,144), LOUIS VUITTON Design (Reg. No. 1,990,760), Epi Leather Design (Reg. No. 2,058,732), Epi Leather Design (Reg. No. 2,071,273), Epi Leather Design (Reg. No. 2,075,141), Epi Leather Design (Reg. No. 2,098,630), Epi Leather Design (Reg. No. 2,147,003), Epi Leather Design (Reg. No. 2,159,848), "Fleur" Design (Reg. No. 2,177,828), "Fleur" in Circle Design (Reg. No. 2,181,753), and Epi Leather Design (Reg. No. 2,263,903). (Hereinafter referred to as the "Louis Vuitton Registered Trademarks"). (Comp.Ex.; Comp. ¶ 26.)

5. The trademarks are associated with, *inter alia,* trunks, valises, traveling bags, hat boxes, shoe boxes used for luggage, hand bags, pocketbooks, traveling bags, satchels, shopping bags and beach bags in the nature of luggage, briefcases, briefcase-type portfolios, wallets, billfolds, passport cases, key cases, credit card cases, business card cases, change purses, umbrellas and walking-stick seats, paper and cardboard goods, namely posters, product catalogs and brochures, product picture albums, product magazines and notepads, calendars, indexes, notebooks, envelopes, labels, writing paper, boxes of cardboard or paper, packing paper, bags of paper or

---

1. To the extent that these findings of fact include conclusions of law or mixed findings of fact and conclusions of law, these findings and conclusions are hereby adopted by this Court.

plastic for packaging, photographs, pencils, pencil holders, fountain pens, ballpoint pens, inkstands, nibs of gold and playing cards. (Comp.Ex.; Comp. ¶ 26.)

6. The Louis Vuitton Registered Trademarks and the goodwill of Louis Vuitton's business in connection with which its trademarks are and have been used, have never been abandoned. (Comp. ¶ 27.)

7. The Louis Vuitton Registered Trademarks have become exclusively associated by the public and the trade with Louis Vuitton. (Comp. ¶ 29.)

8. As a result of Louis Vuitton's extensive advertising in connection with the Louis Vuitton Registered Trademarks, the widespread sale of Louis Vuitton merchandise and the celebrity that Louis Vuitton trademarks have achieved, the goodwill associated with the Louis Vuitton Registered Trademarks is of inestimable value to Louis Vuitton. (Comp. ¶ 30.)

9. Plaintiff Oakley, Inc. ("Oakley") is a corporation duly organized and existing under the laws of the state of Washington having an office and principal place of business at 1 Icon, Foothill Ranch, CA 92610. (Comp. ¶ 7.)

10. As early as 1985, Oakley has been and continues to be actively engaged in the manufacture and sale of high quality sport sunglasses. One of the successful lines of these sunglasses is marketed under the name FROGSKINS. Other current and successful lines of Oakley sunglasses are the BLADES/RAZOR BLADES, M FRAMES, ZEROS, SUB ZEROS, E WIRES, ROMEO and JULIET. (Comp. ¶ 31.)

11. Oakley also actively engages in the manufacture and sale of high quality watches. Some of the successful lines of Oakley watches are INERTIAL GENERATOR and O ENGINE. (Comp. ¶ 32.)

12. As early as 1985, Oakley has registered its trademarks in the United States Patent and Trademark Office. At present, Oakley's U.S. Trademark Registrations include, *inter alia:* OAKLEY (Stylized Text) (Reg. No. 1,356,297), IRIDIUM (Reg. No. 1,485,155), ROGSKINS (Reg. No. 1,486,827), BLADES (Reg. No. 1,519,-593), OAKLEY (Stylized Text) (Reg. No. 1,519,596), OAKLEY (Reg. No. 1,519,823), OAKLEY (Reg. No. 1,521,599), OAKLEY (Reg. No. 1,552,583), SWEEP (Reg. No. 1,687,647), HEATER (Reg. No. 1,701,078), M FRAME (Reg. No. 1,701,476), HIGH DEFINITION OPTICS (Reg. No. 1,719,-875), STRIKE (Reg. No. 1,728,557), UNOBTAINIUM (Reg. No. 1,740,532), HYBRID (Reg. No. 1,778,325), HDO (Reg. No. 1,851,312), T WIRE (Reg. No. 1,952,-458), THE VAULT (Reg. No. 1,968,365), EYE JACKET (Reg. No. 1,970,951), E WIRE (Reg. No. 1,973,974), SLASH (Reg. No. 1,978,257), J EYE JACKET (Stylized Text) (Reg. No. 1,979,602), OAKLEY (Stylized Text) (Reg. No. 1,980,039), Ellipse Design (Reg. No. 1,984,501), Ellipse Design with OAKLEY (Stylized) (Reg. No. 1,990,262), Jagged O Design (Reg. No. 2,209,416), ROMEO (Reg. No. 2,250,767), ROMEO (Stylized) (Reg. No. 2,250,773), RACING JACKET (Reg. No. 2,265,324), CRATER (Reg. No. 2,279,279), MINUTE (Reg. No. 2,337,186), A WIRE (Reg. No. 2,339,802), TEN (Reg. No. 2,364,859), JULIET (Reg. No. 2,388,070), XX Design (Reg. No. 2,388,095), Pro M Frame Design (Reg. No. 2,393,107), Heater Design (Reg. No. 2,403,609), TWENTY (Reg. No. 2,410,-960), and X (Stylized "Metal" Design) (Reg. No. 2,419,394). (Hereinafter referred to as the "Oakley Registered Trademarks"). (Comp.Ex. 2; Comp. ¶ 33.)

13. These trademarks are associated with, *inter alia*, goggles, sunglasses, lenses for sunglasses, accessories for sunglasses, namely, replacement lenses, ear stems and

nose pieces, protective pads for elbows, feet and knees, clothing, namely t-shirts, gloves, racing pants, hats, sweatshirts, sport shirts, jackets, jeans, jerseys and ski pants, socks, vehicle parts, namely, bicycle and motorcycle hand grips, and athletic bags. (Comp.Ex. 2; Comp. ¶ 33.)

14. The Oakley Registered Trademarks are in full force and effect and the goodwill of the business of Oakley in connection with which the trademarks are used, have never been abandoned. (Comp. ¶ 34.)

15. Oakley intends to continue to preserve and maintain its rights with respect to the Oakley Registered Trademarks. (Comp. ¶ 36.)

16. Oakley sunglasses, bearing one or more of the Oakley Registered Trademarks, by reason of their style, distinctive designs and quality have come to be known by the purchasing public throughout the United States as sunglasses of the highest quality. As a result thereof, the Oakley Registered Trademarks and the goodwill associated therewith are of inestimable value to plaintiff Oakley. (Comp. ¶ 37.)

17. Based on Plaintiff's extensive sales of Louis Vuitton articles and Oakley sunglasses and the wide popularity of Louis Vuitton articles and Oakley sunglasses, the Louis Vuitton and Oakley Registered Trademarks have developed a secondary meaning and significance in the minds of the purchasing public and products bearing such marks and names are immediately identified by the purchasing public with plaintiffs Louis Vuitton and Oakley. (Comp. ¶¶ 29 & 38.) (Collectively, the Louis Vuitton Registered Trademarks and the Oakley Registered Trademarks will be referred to as "Plaintiffs' Registered Trademarks.")

18. Plaintiffs' Registered Trademarks are inherently distinctive. (Comp. ¶ 86.)

19. Plaintiffs' Registered Trademarks are world famous and distinctive. (Comp. ¶ 106.)

20. Plaintiffs' Registered Trademarks have acquired secondary meaning indicative of origin, relationship, sponsorship, and/or association with Plaintiffs and their distinctive reputations for high quality. (Comp. ¶ 107.)

21. Based on Plaintiffs' extensive advertising under the Plaintiffs' Registered Trademarks, its extensive sales and the wide popularity of Plaintiffs' products, Plaintiffs' Registered Trademarks have acquired a secondary meaning so that any product and advertisement bearing such trademarks is immediately associated by purchasers and the public as being a product and affiliate of Plaintiffs. (Comp. ¶ 87.)

22. Defendants Christopher Veit ("Veit") and Hena Hasan a/k/a Hena Veit ("Hasan") are a married couple who are Pennsylvania residents who were residing at 1506 Windermere Road, # 103, West Chester, PA 19001 at the beginning of this action, but shortly thereafter moved to 2886 Dorman Avenue, Broomall, PA 19008. (Comp. ¶ 9 and Testimony of Gregory Sherrick, June 5, 2002.)

23. Veit and Hasan were and have been doing business from their residence under the fictitious names Watch Replica, *watchreplica.com,* and *replicatime.com* (hereinafter referred to as the "Websites"). (Comp. ¶ 10.)

24. Veit and Hasan registered and or used the domain name *Louis Vuitton-replicas.com.* (Comp. ¶ 11.)

25. Veit and Hasan established a mailing address at Mailboxes, Etc. P.O. Box located at 3553 West Chester Pike, Suite 308, Newtown, PA 19073. (Comp. ¶ 12.)

26. Swiss Click, Inc. is a Pennsylvania Corporation with an office and principle place of business at 1506 Windermere Road, #103, West Chester, PA 19001. This is identical to the address of Veit and Hasan residence at the time this action was commenced. (Comp. ¶ 14.)

27. Swiss Click, Inc. also uses the same mailing address as defendant Veit and Hasan's Mailboxes, Etc. P.O.Box. (Comp. ¶ 14.)

28. Veit is the CEO and Hasan is the Vice President of Swiss Click, Inc. (Comp. ¶ 15.)

29. The Defendants have established email addresses at: *sales@watchreplica.com*, *shipping@watchreplica.com*, *support@watchreplica.com*, *affiliates@watchreplica.com*, *watrep5@aol.com*, *rolexusa@usa.net* and *rjharpp@aol.com*. (Comp. ¶ 23.)

30. Long after Plaintiffs' adoption and use of Plaintiffs' Registered Trademarks, Defendants advertised, distributed, offered for sale and sold counterfeit Louis Vuitton handbags and other articles bearing one or more of the Louis Vuitton Registered Trademarks and counterfeit Oakley sunglasses bearing one or more of the Oakley trademarks through their websites *watchreplica.com* and *replicatime.com*. (Comp. ¶ 41.)

31. The *replicatime.com* website consists entirely of a "mirror" of *watchreplica.com*, meaning that it contains the exact same content including the name of the website, which is listed on both websites as "Watch Replica." Representative samples of Defendants' pages on the Websites offering replica Louis Vuitton handbags and other related accessories and replica Oakley sunglasses for sale. These counterfeit items could be purchased directly from the internet site. (Comp.Ex. 3; Comp. ¶ 42.)

32. Defendants also operated the website *louisvuitton-replicas.com*, which is no longer an active website. (Printouts of pages from *louisvuitton-replicas.com* on May 4, 2001, when it was an active website, Comp.Ex. 4; Comp. ¶ 43.)

33. On September 6, 2000, Plaintiff Oakley notified the Defendants, by email of the illegality and potential penalties of selling sunglasses bearing counterfeit Oakley Registered Trademarks. Thus, the Defendants were so notified before the commencement of this lawsuit. (Comp.Ex. 5; Comp. ¶ 44.)

34. On December 15, 2000, Plaintiff Louis Vuitton's private investigator ordered a Louis Vuitton Monogram umbrella online at *watchreplica.com*. (Comp. ¶ 45.)

35. On December 21, 2000, Plaintiff Louis Vuitton's private investigator received a Monogram umbrella from the Defendants. The return address for the package was Swiss Click, Inc. at Defendant Veit and Hasan's Mailboxes, Etc. P.O. Box address. (Digital image of the umbrella, Comp.Ex. 6; Comp. ¶ 61.)

36. Louis Vuitton's Industrial Property Director, an expert on Louis Vuitton's products and trademarks, has examined the umbrella and determined that it is counterfeit. The pattern is more than twice the size as a genuine Monogram umbrella, the wood handle should be made from Noble Wood but it is not and the overall quality of the umbrella is lower than that of a genuine Louis Vuitton umbrella. (Aff. of Authenticity of Helene Ramonatxo, Comp.Ex. 7; Comp. ¶ 62.)

37. The counterfeit Louis Vuitton Umbrella ordered from *watchreplica.com* bears several Louis Vuitton Registered Trademarks including LV (Interlocked Letters) Design, LV (Interlocked Letters) with Monogram Canvas Design, Mono-

gram Canvas Design, "Fleur" Design and "Fleur" in a circle design. (Comp. ¶ 63.)

38. On March 13, 2001, Plaintiff Oakley's private investigator ordered a pair of Oakley Romeo Sunglasses from *watchreplica.com* by mailing a money order to Veit and Hasan's Mailboxes, Etc. P.O. Box. (Comp. ¶ 64.)

39. On April 5, 2001, Plaintiff Oakley's private investigator received a pair of Oakley Romeo Sunglasses from *watchreplica.com*. The return address on the package was Net Gifts, Inc. at Kelvin's Mailboxes, Etc. P.O. Box. (Digital images of the sunglasses received from *watchreplica.com*, Comp.Ex. 8; Comp. ¶ 65.)

40. Oakley's U.S. Intellectual Property Enforcement Specialist has evaluated the pair of sunglasses received from *watchreplica.com*. and determined that they are a counterfeit imitation of Oakley Romeo sunglasses (the "Counterfeit Sunglasses"). Unlike a genuine pair of Oakley Romeo sunglasses, the Counterfeit Sunglasses are missing rubber earsocks and a nosepiece; the frame is not cleanly molded and contains blemishes and imperfections; and the Counterfeit Sunglasses have the "Oakley" trademark in the wrong place. (Aff. of Sandy Beattie, Comp.Ex. 9; Comp. ¶ 66.)

41. The Counterfeit Sunglasses contain the Oakley Registered Trademarks OAKLEY and OAKLEY (Stylized Text). (Comp. ¶ 67.)

42. On May 16, 2001, Plaintiffs' counsel notified the Defendants by regular mail and email of the illegality and potential penalties of articles bearing counterfeit Louis Vuitton Registered Trademarks. Thus, the Defendants were so notified before the commencement of this lawsuit. (Copy of counsel's correspondence, Comp. Ex. 10; Comp. ¶ 68.)

43. At the time this action commenced the websites *watchreplica.com* and *replica-*

*time.com* were still offering for sale counterfeit Louis Vuitton handbags and other articles and counterfeit Oakley sunglasses. (Comp. ¶ 69.)

44. The Defendants have, through the *watchreplica.com, replicatime.com, louis-vuitton-replicas.com* websites offered for sale Louis Vuitton handbags and related articles bearing counterfeit Louis Vuitton Registered Trademarks and sunglasses bearing Oakley Registered Trademarks despite knowledge that such sales are illegal. (Comp. ¶ 70.)

45. The Defendants have registered and/or used the domain name *louisvuitton-replicas.com*, which incorporates the Louis Vuitton Registered Trademark LOUIS VUITTON for the purpose of selling counterfeit Louis Vuitton merchandise. (Comp. ¶ 71.)

46. The Defendants' acts as aforesaid are deliberately calculated to confuse and to deceive the public and are performed with full knowledge of Plaintiffs' rights. (Comp. ¶ 72.)

47. The Defendants are not now, nor have they ever been, associated, affiliated or connected with, or endorsed or sanctioned by the Plaintiffs. (Comp. ¶ 73.)

48. The Defendants have used spurious designations that are identical with, or substantially indistinguishable from, Plaintiffs' Registered Trademarks on goods covered by registrations for Plaintiffs' Registered Trademarks. (Comp. ¶ 77.)

49. The Defendants have intentionally used these spurious designations knowing they are counterfeit in connection with the advertising, sale, offering for sale and distribution of goods. (Comp. ¶ 78.)

50. Defendants' use of Plaintiffs' Registered Trademarks to advertise, offer for sale, distribute and sell Defendants' counterfeit watches, handbags and related ac-

cessories and sunglasses was and is without the consent of Plaintiffs. (Comp. ¶ 79.)

51. Defendants' unauthorized use of Plaintiffs' Registered Trademarks on and in connection with his advertising and sale of counterfeit merchandise through the World Wide Web constitutes Defendants' use of Plaintiffs' Registered Trademarks in commerce. Defendants' unauthorized use of Plaintiffs' Registered Trademarks as set forth above is likely to:

(a) cause confusion, mistake and deception;

(b) cause the public to believe that Defendants' merchandise is the same as Plaintiffs' watches and/or that Defendants are authorized, sponsored or approved by Plaintiffs or that Defendants are affiliated, connected or associated with or in some way related to Plaintiffs;

(c) result in Defendants unfairly benefitting from Plaintiffs' advertising and promotion and profiting from the reputation of Plaintiffs and its Registered Trademarks all to the substantial and irreparable injury of the public, Plaintiffs and Plaintiffs'

Plaintiffs' Registered Trademarks and the substantial goodwill represented thereby. (Comp. ¶ 80 & Comp. ¶ 81.)

52. Defendants have intentionally used Plaintiffs' Registered Trademarks knowing they are the exclusive property of Plaintiffs in connection with the sale, offering for sale and distribution of goods. (Comp. ¶ 89.)

53. Defendants' activities as aforesaid creates the false and misleading impression that Defendants are sanctioned, assigned or authorized by Plaintiffs to use Plaintiffs' Registered Trademarks to advertise, manufacture, distribute, appraise, offer for sale or sell merchandise bearing Plaintiffs' Registered Trademarks when

Defendants are not so authorized. (Comp. ¶ 90.)

54. Defendants engage in the aforementioned activities with the intent to confuse and deceive consumers into believing that Defendants and the merchandise they sell are in some way sponsored, affiliated or associated with Plaintiffs, when in fact they are not. (Comp. ¶ 91.)

55. Defendants' use of one or more of Plaintiffs' Registered Trademarks in their advertising and on their counterfeit goods has been without the consent of Plaintiffs, is likely to cause confusion and mistake in the minds of the purchasing public and, in particular, tends to and does falsely create the impression that the goods advertised and sold by the Defendants are warranted, authorized, sponsored or approved by Plaintiffs when, in fact, they are not. (Comp. ¶ 92.)

56. Defendants' unauthorized use of Plaintiffs' Registered Trademarks as set forth above has resulted in Defendants unfairly benefitting from Plaintiffs' advertising and promotion, and profiting from the reputation of Plaintiffs and Plaintiffs' Registered Trademarks, to the substantial and irreparable injury of the public, Plaintiffs and Plaintiffs' Registered Trademarks and the substantial goodwill represented thereby. (Comp. ¶ 93.)

57. Defendants have affixed, applied and used in connection with their sale of goods, false designations of origin and false and misleading descriptions and representations, including Plaintiffs' Registered Trademarks which tend falsely to describe the origin, sponsorship, association or approval by Plaintiffs of the goods Defendants sell. (Comp. ¶ 98.)

58. Defendants use one or more of Plaintiffs' Registered Trademarks with full knowledge of the falsity of such designations of origin, descriptions and represen-

tations, all to the detriment of Plaintiffs. (Comp. ¶ 99.)

59. Defendants' use of Plaintiffs' Registered Trademarks on their website and counterfeit goods constitutes false descriptions and representations tending falsely to describe or represent Defendants and Defendants' products as being authorized, sponsored, affiliated or associated with Plaintiffs. (Comp. ¶ 100.)

60. Defendants use one or more of Plaintiffs' Registered Trademarks on their website and counterfeit goods with the express intent to cause confusion and mistake, to deceive and mislead the purchasing public, to trade upon the high quality reputation of Plaintiffs and to improperly appropriate to itself the valuable trademark rights of Plaintiffs. (Comp. ¶ 101.)

61. The purchasing public is likely to attribute to Plaintiffs Defendants' use of Plaintiffs'. Registered Trademarks as a source of origin, authorization and/or sponsorship for the products Defendants sells and further, purchase Defendants' products in the erroneous belief that Defendants are associated, sponsored by or affiliated with Plaintiffs, when Defendants are not. (Comp. ¶ 107.)

62. Defendants have intentionally and willfully appropriated Plaintiffs' Registered Trademarks and traded upon Plaintiffs' reputations. (Comp. ¶ 110.)

63. The domain name *louisvuitton-replicas.com* incorporates the Louis Vuitton Registered Trademark LOUIS VUITTON. (Comp. ¶ 114.)

64. The LOUIS VUITTON trademark was already world famous when the *louisvuitton-replicas.com* domain name was registered. (Comp. ¶ 115.)

65. Use of the LOUIS VUITTON mark in the domain name *louisvuitton-replicas.com* constitutes an identical or confusingly similar use of the LOUIS VUITTON mark. (Comp. ¶ 116.)

66. The Defendants registered and/or used the domain name *louisvuitton-replicas.com* for the purpose of selling counterfeit Louis Vuitton merchandise. (Comp. ¶ 117.)

67. The Defendants registration and/or use of a domain name that incorporates the LOUIS VUITTON registered trademarks for the purpose of selling counterfeit good bearing this trademark constitutes bad faith and intent to profit from the goodwill of the Louis Vuitton Registered Trademarks. (Comp. ¶ 118.)

68. The Defendants have no trademark rights in the domain name *louisvuitton-replicas.com.* (Comp. ¶ 120.)

69. The Defendants' legal names have no connection to the domain name *louisvuitton-replicas.com.* (Comp. ¶ 121.)

70. The Defendants have no prior bona fide use of the *louisvuitton-replicas.com* domain name offering goods and services. (Comp. ¶ 122.)

71. The Defendants have no bona fide noncommercial or fair use of the mark LOUIS VUITTON in the domain name *louisvuitton-replicas.com.* (Comp. ¶ 123.)

72. Defendants' wrongful acts of counterfeiting will continue unless enjoined by this Court. (Comp. ¶¶ 84, 95, 111.)

73. The Plaintiffs are suffering and will continue to suffer irreparable harm from the aforementioned acts. (Comp. ¶¶ 81, 83, 93, 108.)

74. Defendants' activities as aforesaid constitute Defendants' use in commerce of Plaintiffs' Registered Trademarks. Defendants use Plaintiffs' Registered Trademarks in connection with the Defendants' sale, distribution and advertising of their counterfeit goods. Defendants' use of Plaintiffs' Registered Trademarks on their

website and products in order to sell their counterfeit goods over the Internet constitutes Defendants' commercial use in commerce of Plaintiffs' Registered Trademarks. (Comp. ¶¶ 88, 97, 105.)

75. After being served with the Complaint, the Defendants continued to offer for sale and sell counterfeit Louis Vuitton and Oakley products on the Websites. (Testimony of Matthew Carlin, June 5, 2002.)

76. At the time the Plaintiffs moved for entry of default judgment, the Defendants were continuing to offer for sale items willfully infringing upon at least the following Louis Vuitton Registered Trademarks:

1. 286,345 LV (Interlocked Letters) Design
2. 297,594 LV (Interlocked Letters) with Monogram Canvas Design
3. 1,519,828 LV (Interlocked Letters) Design
4. 1,643,625 Noe Style Handbag with LV (Interlocked Letter) and Monogram Canvas Design
5. 1,770,131 LV (Interlocked Letters) with Monogram Canvas Design
6. 1,990,760 LOUIS VUITTON
7. 2,361,695 LV (Interlocked Letters) Design
8. 2,177,828 "Fleur" Design
9. 2,181,753 "Fleur" in a Circle Design

Three of the trademarks (286,345; 297,594; and 1,519,828) are for the same trademark in different classifications. Given the foregoing findings of fact, it is likely that Defendants had willfully infringed upon additional Louis Vuitton trademarks at the time that Plaintiffs moved for entry of default judgment. (Testimony of Matthew Carlin, June 5, 2002; Affidavit of Matthew Carlin, Document No. 22.)

77. At the time the Plaintiffs moved for entry of default judgment, the Defendants were continuing to offer for sale items willfully infringing upon at least the following two (2) Oakley Registered Trademarks:

(1) 1,521,599 OAKLEY

(2) 1,519,596 OAKLEY (Stylized Text)

Given the foregoing findings of fact, it is likely that Defendants had willfully infringed upon additional Oakley trademarks at the time that Plaintiffs moved for entry of default judgment. *Id.*

78. The Defendants did not file an answer in this action. (Clerk's Entry of Default.)

79. The Defendants received service of the complaint and notice of the evidentiary hearing held on June 5, 2002. (Testimony of Gregory Sherrick on June 5, 2002; Aff. of Gregory Sherrick, Pls.' Trial Ex. 1; Document Nos. 4 and 6.)

80. The Defendants have failed to appear in the instant action and have failed to produce any records or other evidence of their sales. (Clerk's Entry of Default; Testimony of Matthew Carlin, June 5, 2002.)

81. The internet is used by more than 143 million Americans. (*See American Library Association, Inc. v. U.S.*, 201 F.Supp.2d 401, 405–06 (E.D.Pa.2002).)

## II. CONCLUSIONS OF LAW[2]

 1. Defendants Hasan and Veit are subject to the jurisdiction of this Court

---

2. To the extent that these conclusions of law include findings of fact or mixed findings of fact and conclusions of law, these findings and conclusions are hereby adopted by this Court. Upon listening to the testimony of Gregory Sherrick and Matthew Carlin in the context of the entire evidentiary record in this case, the Court finds both witnesses to be a credible witness, and credits their testimony

because they are both domiciled in and conduct substantial business within this District. (Comp. ¶ 13.)

2. Swiss Click, Inc. is subject to the jurisdiction of this Court because it is incorporated under the laws of this state. (Comp. ¶ 16.)

3. This Court has subject matter jurisdiction over the claims in this action which relate to trademark counterfeiting and infringement and false designations of origin, false descriptions and cybersquatting (cyberpiracy) pursuant to the provisions of 15 U.S.C. §§ 1121 and 1125(d)(1)(A) and 28 U.S.C. §§ 1331 and 1338(a). (Comp. ¶ 2.)

4. This Court has supplemental jurisdiction over the claims in this Complaint which arise under the statutory and common law of the State of Pennsylvania pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact. (Comp. ¶ 3.)

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). (Comp. ¶ 4.)

as an accurate description of the events in question.

**3.** Section 1114 provides, in relevant part:
(1) *Any person who shall, without the consent of the registrant*—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements in-

*Liability*

■ 6. Federal trademark infringement, 15 U.S.C. § 1114(1)(a),[3] and a false designation of origin claim, known more broadly as federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards. See *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir.2000). To prove either form of the Lanham Act violation, the record must demonstrate that (1) plaintiff has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. *See id.* The first two requirements are satisfied when a federally registered mark has become incontestable.[4] *See Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc.*, No. Civ.A. 96–6961, 1998 WL 288423, at *3 (E.D.Pa. June 3, 1998) (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466 (3d Cir.1994)).

■ 7. To establish federal trademark counterfeiting, the record must show that (1) the defendants infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing that is was counterfeit or was willfully blind to such use. *See Playboy Enter., Inc. v. Univer-*

tended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

**4.** "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons*, 30 F.3d at 472 n. 7.

*sal Tel–A–Talk, Inc.*, No. Civ.A. 96–6961, 1998 WL 767440, at *7 (E.D.Pa. Nov.3, 1998).

8. Pursuant to the Lanham Act, the term counterfeit mark means "a mark that is registered on the Principal Register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d)(1)(B)(i). A "counterfeit" is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. In a more general sense, counterfeiting has been defined as " 'the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark.' " *Playboy*, 1998 WL 767440, at *7 (quoting Thomas McCarthy, *McCarthy on Trademarks* § 25:10 (3d ed.1997)).

■ 9. The only material distinction between the standard for federal trademark counterfeiting and the standard for showing trademark infringement is that in order to obtain treble or statutory damages for a counterfeiting claim, as discussed in greater detail below, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing it was a counterfeit. *See Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.*, No. Civ.A. 96–6961, 1998 WL 288423, at *2 (E.D.Pa. June 3, 1998); 15 U.S.C. § 1117.

■ 10. A *prima facie* claim of trademark dilution under § 1125(c)[5] includes a showing that (1) the plaintiff owns a "fa-

mous" mark; (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) the Defendant's use began after the plaintiff's mark became famous; and (4) the Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).

11. Many of the Louis Vuitton Registered Trademarks have become incontestable pursuant to 15 U.S.C. § 1065. (Comp. ¶ 28.)

12. Several of the Oakley Registered Trademarks have become incontestable pursuant to 15 U.S.C. § 1065. (Comp. ¶ 35.)

13. Defendants' acts as aforesaid constitute:

■ A. Trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114;

■ B. Trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114;

■ C. The use in commerce of false designations of origin and false and/or misleading descriptions or representations, tending to falsely or misleadingly describe and/or represent Defendants' products as those of Plaintiffs in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and

■ D. Trademark dilution of the distinctive quality of Plaintiffs'

---

5. Section 1125(c) provides, in relevant part:
(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

Registered Trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

(*See* Findings of Fact ¶¶ 17–21, 30–31, 34–41, 43–62, 72–74, 76–77.)

14. The Federal Anti–Cybersquatting Act, 15 U.S.C. § 1125(d), is intended to prevent "cybersquatting," which refers to the "bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir.2001) (citation omitted). A successful claim is premised upon a showing that (1) the plaintiff's mark is distinctive or famous; (2) the defendant's domain names are identical to confusingly similar to plaintiff's marks; and (3) the defendant registered his domain name with the bad faith intent to profit from it. *See id.* at 482.

15. The Defendants registration and/or use of the *louisvuitton-replicas.com* domain name constitutes trademark dilution. (Comp. ¶ 119.)

16. Defendant's aforementioned acts constitute Cybersquatting (Cyberpiracy) pursuant to 15 U.S.C. § 1125(d)(1)(A). (*See* Findings of Fact ¶¶ 17–21, 24, 32, 63–74.)

17. The common law cause of action for unfair competition in Pennsylvania mirrors the Lanham Act's section 43(a) cause of action for unfair competition, except that under state law there is no requirement that the goods traveled through interstate commerce. *See Haymond v. Lundy*, No. Civ.A. 99–5048, 2001 WL 15956, at *2 (E.D.Pa. Jan.5, 2001); *Gideons Int'l Inc. v. Gideon 300 Ministries, Inc.*, 94 F.Supp.2d 566, 580 (E.D.Pa.1999).

18. Having concluded that Defendants' actions constitute unfair competition under the Lanham Act, (*see* Conclusion of law ¶ 13), I likewise conclude that Defendants actions constitute unfair competition under Pennsylvania common law.

19. Under Pennsylvania statutory law regarding trademark dilution: "The owner of a mark which is famous in this Commonwealth shall be entitled ... to an injunction against another person's commercial use of a mark or trade name if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 54 Pa.C.S.A. § 1124. Thus, the standard for establishing trademark dilution under Pennsylvania law is the same as under federal law.

20. Having concluded that Defendants' actions constitute trademark dilution under the Lanham Act, (*see* Conclusion of law ¶ 13), I likewise conclude that Defendants actions constitute trademark dilution pursuant to 54 Pa.C.S.A. § 1124.

### Damages and Equitable Relief

21. The statutory damages provision of the Trademark Act provides that:

In a case involving the use of a counterfeit mark (as defined in § 34(d), 15 U.S.C. § 1116(d)) in connection with the sale, offering for sale, or distribution of goods or services, *the Plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) an award of statutory damages* for any such use in connection with the sale, offering for sale or distribution of goods or services in the amount of

(1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed as the court considers just; or

(2) *If the court finds that the use of the counterfeit mark was willful, not more*

*than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.*

15 U.S.C. § 1117(c) (emphasis added). Thus, in cases involving the use of a counterfeit mark, the plain language of the statute affords plaintiffs the right to pursue statutory damages without proving actual damages; however, the statute does not provide guidelines for courts to use in determining an appropriate award.

22. The statute is clear that in order to award the maximum $1 million award, the defendants must have engaged in willful conduct, which entails "an aura of indifference to plaintiff's rights" or a "deliberate and unnecessary duplicating of a plaintiff's mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir.1999) (citations omitted).

23. Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice. *See Video Views, Inc. v. Studio 21 Ltd.*, 925 F.2d 1010, 1021 (7th Cir.1991), *abrogation on other grounds recognized, Budget Cinema Inc. v. Watertower Associates*, 81 F.3d 729 (7th Cir.1996); *Choice Hotels Int'l, Inc. v. Pennave Assoc.*, 159 F.Supp.2d 780, 782, 786 (E.D.Pa.2001). *See also Columbia Pictures Industries Inc. vs. Sandrow*, Civ.A. No. 87–3279, 1988 WL 28249, at *4 (E.D.Pa. Mar.23, 1988) (determining that continued activity after receipt of "cease and desist" letter was "more blameworthy").

24. In the present case, after receiving notice of the illegality and potential penalties of selling sunglasses bearing counterfeit Oakley Registered Trademarks, of articles bearing counterfeit Louis Vuitton Registered Trademarks, and after the summons and complaint were served upon defendants, the Defendants continued to infringe upon and counterfeit eight (8) of the registered Trademarks of the Plaintiffs. The failure of Defendants to appear at the Evidentiary Hearing held on June 5, 2002 and defend amounts to their conscious snubbing and blatant disregard of both the legal system and the rights of the Plaintiffs. The aforementioned conduct was willful. (*See* Findings of Fact ¶¶ 33, 42, 75–77, 79.)

25. Having so concluded, I turn to determining the appropriate amount of damages to award for this willful conduct.

26. The purpose of § 1117 of the Trademark Act is to take the incentive out of counterfeiting and strengthen the civil remedies against counterfeiters. *See* S.Rep. No. 177, 104th Cong.1995. In amending § 1117 to provide for recovery of statutory damages, Congress recognized that "a civil litigant may not be able to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting." *Id.* It is often the case that counterfeiters' records are frequently non-existent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting activity actually engaged in, making proving actual damages in these cases extremely difficult if not impossible. *See id.*

27. In the absence of clear guidelines for setting a statutory damage award, courts have tended to use their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often borrowing from factors developed in fixing a statutory damage award for copyright infringement. *See Rolex Watch U.S.A., Inc. v. Brown*, No. 01 Civ. 9155 JGK AJP, 2002 WL 1226863, at *2 (S.D.N.Y. June 5, 2002) (awarding $1 million maximum without

multiplication for multiple marks where plaintiffs sought $1 million for each mark); *Rolex Watch U.S.A., Inc. v. Jones*, No. 99 Civ. 2359(DLC)(FM), 2002 WL 596354, at *5–6 (S.D.N.Y. Apr. 17, 2002) (awarding $500,000 for internet sales); *Microsoft Corp. v. Wen*, No. C 99–04561, 2001 WL 1456654, at *5 (N.D.Cal. Nov.13, 2001) (plaintiffs argued entitlement to maximum of $1 million for each of nine counterfeit marks, but only sought a total of $450,000 which court granted); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950, at *11 (N.D.Ill. Jan.22, 2001) (court granted plaintiffs' request for $200,00 for each of seven trademarks); *Microsoft Corp. v. Compusource Distrib., Inc.*, 115 F.Supp.2d 800, 811–12 (E.D.Mich.2000) (plaintiffs argued entitlement to maximum of $1 million for each of eight counterfeit marks, but only sought a total of $100,000 for each mark; court awarded $50,000 for each mark for "egregious conduct"); *Sara Lee Corporation v. Bags of New York, Inc.*, 36 F.Supp.2d 161 (S.D.N.Y.1999) (awarding $750,000); *Playboy Enter., Inc. v. Smith*, No. Civ.A. 97–734–A, 1998 WL 724000, at *8–9 (E.D.Va. Apr.10, 1998); (determining that maximum award warranted because of "broad, extensive, blatant, and willful" internet sales, but that award should be lowered to $500,000 for each merchandise category); *Playboy*, 1998 WL 767440, at *9 (awarded $10,000).

■■■ 28. In analyzing the appropriate statutory award for copyright infringement cases, courts consider the defendant's profits, as well as saved expenses, the plaintiff's lost revenues, and the defendant's state of mind. *See Palmer v. Slaughter*, No. Civ.A. 99–899–GMS, 2000 WL 1010261, at *3 (D.Del. July 13, 2000); *U2 Home Entm't, Inc. v. Kim*, No. Civ.A. 98–CV–4159, 1998 WL 966084, at *3 (E.D.Pa. Nov.4, 1998);

*Sony Music Entm't v. Cassette Prod., Inc.*, Civ.A. No. 92–4494(JCL), 1996 WL 673158, at *6 (D.N.J. Sept.30, 1996) (awarding maximum); *Broadcast Music, Inc. v. DeGallo, Inc.*, 872 F.Supp. 167, 169 (D.N.J.1995); *Universal City Studios, Inc. v. Ahmed*, No. Civ.A. 93–3266, 1994 WL 185622, at *3 (E.D.Pa. May 13, 1994) (emphasizing that defendant's conduct is most important and that award escalates in direct proportion to blameworthiness) (citation omitted); *Somerset Songs Publ'g, Inc. v. Wykes*, No. Civ.A. 92–6907, 1993 WL 437705, at *4 (E.D.Pa. Oct.29, 1993). In the present case, as no discovery ever occurred, the first two factors cannot be assessed.

29. In addition to the willful conduct of the Defendants, I also find that the point of sale is very relevant to the statutory damages discussion. This case represents the new era of counterfeiting. No longer are these cases limited to the street vendor. Now, counterfeiters have the internet as their arsenal. As found, 143 million Americans use the internet and represent the counterfeiter's potential customer base. (*See* Findings of Fact ¶ 81.) While the record contains no evidence of the actual scope of the defendants' sales, nor the number of hits the internet site received, given the scope of the internet supermarket, such sale offerings are presumptively quite high and proscribed by the Lanham Act. *See Rolex*, 2002 WL 596354, at *5 (noting significance of using network of internet sites).

30. In similar cases concerning multiple marks, courts have been inclined to either award the maximum without multiplication or to lower the per mark award. *See Rolex*, 2002 WL 1226863, at *2; *Playboy*, 1998 WL 724000, at *8–9. I agree with this logic. While this case certainly calls for a high damage award, given the egregious conduct of the Defendants and

the use of the internet, I conclude that a total award of $1,000,000 for the six Louis Vuitton marks and an award of $500,000 for the two Oakley marks ensures the dual objectives of compensating Plaintiffs and deterring Defendants.

31. Pursuant to 15 U.S.C. § 1125(d)(1), the Anticybersquatting Consumer Protection Act ("ACPA"), Plaintiff Louis Vuitton may recover Statutory Damages ranging from $1,000.00 to $100,000.00 per domain name. 15 U.S.C. § 1117(d). *See also Shields,* 254 F.3d at 481, 487 (3d Cir.2001).

32. This Court has "discretion to award statutory damages it 'considers just' within a range from $1,000 to $100,000 per infringing domain name." *Id.* at 487 (affirming award of $10,000 per domain name); *Electronics Boutique Holdings Corp. v. Zuccarini,* 2000 WL 1622760 (E.D.Pa. 2000) (awarding $100,000 per domain name).

33. In this case, in light of the Defendants' egregious acts in blatantly using Plaintiff Louis Vuitton's registered trademark to sell counterfeit Louis Vuitton products in the exercise of my discretion, Plaintiff Louis Vuitton will be awarded damages in the amount of $100,000 for the infringing domain name.

34. Plaintiffs have requested a permanent injunction to prevent any future trademark infringement by the Defendants or any related entities. Their proposed injunction includes not only the eight trademarks which plaintiffs have affirmatively shown to have been infringed, (*see* Findings of Fact ¶¶ 76–77), but approximately eighty (80) additional trademarks. This Court has found that it is likely that Defendants infringed upon more that the eight trademarks specifically shown to have been infringed. (*See id.*) However, Plaintiffs have failed to offer support, either by way of an allegation in

the complaint that has gone unanswered, or by testimony or affidavit, for the proposition that Defendants have infringed upon each trademark for which Plaintiffs seek protection. Without such support in the record, this Court will not exercise its discretion to issue a permanent injunction expressly covering the eighty trademarks.

35. Plaintiffs have shown, and the Defendants admit by their default, their past (and continuing) trademark infringement as to the specified eight trademarks for which Plaintiffs have sought statutory damages. (*See id.*) Pursuant to the Lanham Act, 15 U.S.C. § 1116, a permanent injunction restraining further infringements of these Plaintiffs' trademarks will, therefore, be issued, and the Defendants will be enjoined from any future infringing actions. (*See* Findings of Fact ¶¶ 72–73.)

36. The Lanham Act and the ACPA provide that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

37. While the statute does not explicitly define the term "exceptional," generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful. *Securacomm Consulting, Inc. v. Securacom Inc.,* 224 F.3d 273, 280 (3d Cir.2000). Having concluded that the Defendants' conduct was willful, I conclude that the Plaintiffs are entitled to attorneys' fees and costs.

38. According to the Declaration of M. Kelly Tillery, Esquire, Plaintiffs have incurred attorneys' fees and costs totaling $46,504.88. (Document No. 19.)

39. These fees an costs are reasonable. It is evident from the statements in the declaration that the hours spent on this case were necessary and the billable rate fair.

40. Plaintiffs are therefore entitled to their attorneys' fees and costs pursuant to 15 U.S.C. § 1117(b) in prosecuting this action in the amount of $46,504.88.

## III. CONCLUSION

For the aforementioned reasons, pursuant to Federal Rule of Civil Procedure 55(b), this Court will enter final default judgment in favor of Louis Vuitton Malletier and Oakley, Inc. and against Christopher Veit, Hena Hasan a/k/a Hena Veit, individually and d/b/a Watch Replica, *watchreplica.com*, and *replicatime.com;* Swiss Click, Inc.; and Michael Kelvin a/k/a Richard Jones, Individually and d/b/a Netgifts and Net Gifts, Inc.

An appropriate order and Permanent Injunction follows.

### *PERMANENT INJUNCTION*

**AND NOW,** this 26th day of June, 2002, upon consideration of the motion of Plaintiffs for default judgment, including money damages, and a permanent injunction, (Document No. 9), pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, in addition to the pleadings, the exhibits, the affidavits and memorandum of law in support thereof, as well as the arguments of counsel at evidentiary hearing held on June 5, 2002, and based on the foregoing findings of fact and conclusions of law, including the findings and conclusions that Defendants received service of the complaint and notice of the evidentiary hearing held on June 5, 2002 but failed to either answer the complaint or appear in Court, and that Defendants willfully infringed upon at least eight (8) of Plaintiffs' trademarks (including certain registrations which are for the same mark), it is hereby **ORDERED** and **DECLARED** that Defendants Christopher Veit and Hena Hasan a/k/a Hena Veit, individually and d/b/a Watch Replica, Watchreplica.com, Replica-

time.com and Swiss Click, Inc. ("Defendants"), along with their directors, principals, officers, agents, servants, employees, representatives, attorneys, successors, and assigns, and all those persons or entities aiding and abetting. or acting in concert or participation with them (the "Enjoined Parties") shall be and hereby are **PERMANENTLY ENJOINED** and restrained from:

(a) imitating, copying, or making any other unauthorized use of or engaging in any unlawful or unauthorized sale and/or distribution of products protected by Plaintiffs' Registered Trademarks and Trade Names, including, but not limited to, the following Vuitton Trademark and/or Service Mark Registration Numbers:

(1) 286,345 (LV (Interlocked Letters) In A Circle);

(2) 297,594 (LV (Interlocked Letters) and Monogram Canvas Design);

(3) 1,519,828 (LV (Interlocked Letters) Design);

(4) 1,643,625 (Noe Style Handbag Design with LV (Interlocked Letters) and Monogram Canvas Design);

(5) 1,770,131 (LV (Interlocked Letters) and Monogram Canvas Pattern Design);

(6) 1,990,760 (LOUIS VUITTON Design);

(7) 2,177,828 ("Fleur" Design);

(8) 2,181,753 ("Fleur" in Circle Design);

(9) 2,361,695 (LV (Interlocked Letters) Design);

and the following Oakley Trademark and/or Service Mark Registration Numbers:

(10) 1,519,596 ("OAKLEY" (Stylized Text));

(11) 1,521,599 ("OAKLEY");

(b) duplicating, assembling, producing, distributing, offering for sale or distribution, circulating, advertising, importing, exporting, marketing, promoting, printing, displaying, transferring and/or moving any product or thing bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' Registered Trademarks, Trade Name, or Service Marks, including, but not limited to, the marks represented by the Trademark and Service Mark Registration Numbers listed in subsection (a) above;

(c) using any simulation, reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' Registered Trademarks, Trade Name or Service Marks, including, but not limited to, marks represented by the Trademark, Service Mark Registration Numbers listed in subsection (a) above, in connection with the manufacture, duplication, assembly, production, distribution, offer for distribution, sale, circulation, advertisement, import, export, marketing, promotion, printing, display, transfer and/or movement, of any product or thing not authorized or licensed by Plaintiffs;

(d) engaging in any other activity constituting an infringement of Plaintiffs' Trademarks or of Plaintiffs' rights in, or right to use or to exploit said Trademarks, or constituting any dilution of Plaintiffs' name, reputation, or goodwill;

(e) using any false designation of origin or false description which can or is likely to lead the trade or public or individual members thereof, erroneously to believe that any product or thing has been manufactured, duplicated, assembled, produced, distributed, offered for distribution, circulated, advertised, imported, exported, marketed, promoted, printed, displayed, transferred, moved, licensed, sponsored, approved, or authorized by or for Plaintiffs, when such is not true in fact;

(f) using reproductions, counterfeits, copies, or colorable imitations of Plaintiffs' trademark protected products in the manufacture, duplication, assembly, production, distribution, offer for distribution, circulation, advertisement, import, export, marketing, promotion, printing, display, transfer and/or movement, of spurious merchandise not authorized by Plaintiffs;

(g) using the name, logo, or other variations thereof of Plaintiffs' trademark protected products in any of Defendants' trade, corporate or domain names;

(h) engaging in any other activity constituting an infringement of any of Plaintiffs' Trademarks or Service Marks or of Plaintiffs' rights in, or right to use or to exploit said Trademarks or Service Marks; and

(i) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (h) above.

**IT IS FURTHER ORDERED** that Plaintiffs shall cause a true copy of the within injunction to be served by one or more reasonable methods upon the individual Defendants and their known attorneys and other agents and that Plaintiffs shall file a certificate of that service with the Clerk of Court promptly upon service being affected.

### AMENDED DEFAULT JUDGMENT AND ASSESSMENT OF DAMAGES

**AND NOW,** this 28th day of June, 2002, upon consideration of a typographical error, the Default Judgment and Assessment of Damages issued on June 26, 2002, is hereby **AMENDED,** to provide as follows:

Upon consideration of the motion the motion of Plaintiffs for default judgment, including money damages, and a permanent injunction, (Document No. 9), pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, in addition to the pleadings, the exhibits, the affidavits and memorandum of law in support thereof, as well as the arguments of counsel at evidentiary hearing held on June 5, 2002, and based on the foregoing findings of fact and conclusions of law, including the findings that Defendants received service of the complaint and notice of the evidentiary hearing held on June 5, 2002 but failed to either answer the complaint or appear in Court, it is hereby **ORDERED** and **DECLARED** that:

1. Defendants Christopher Veit and Hena Hasan a/k/a Hena Veit, individually and d/b/a Watch Replica, Watchreplica.com, Replicatim.com and Swiss Click, Inc. ("Defendants") are jointly and severally liable to Plaintiffs for willful trademark infringement under Federal Law, 15 U.S.C. § 1114 *et seq.*, and under the laws of the Commonwealth of Pennsylvania, resulting from their unauthorized imitation and use in commerce of at least the following Louis Vuitton Trademark Registration Numbers:

(1) Reg. No. 286,345 LV (Interlocked Letters) Design

(2) Reg. No. 297,594 LV (Interlocked Letters) with Monogram Canvas Design,

(3) Reg. No. 1,519,828 LV (Interlocked Letters) Design

(4) Reg. No. 1,643,625 Noe Style Handbag with LV (Interlocked Letter) and Monogram Canvas Design

(5) Reg. No. 1,770,131 LV (Interlocked Letters) with Monogram Canvas Design

(6) Reg. No. 1,990,760 LOUIS VUITTON

(7) Reg. No. 2,361,695 LV (Interlocked Letters) Design

(8) Reg. No. 2,177,828 "Fleur" Design

(9) Reg. No. 2,181,753 "Fleur" in a Circle Design

and at least the following Oakley Trademark and/or Service Mark Registration Numbers:

(10) Reg. No. 1,521,599 OAKLEY

(11) Reg. No. 1,519,596 OAKLEY (Stylized Text)

2. Defendants are liable to Plaintiffs for unfair competition under Federal Law, 15 U.S.C. § 1125, and under the laws of the Commonwealth of Pennsylvania.

3. Defendants are liable to Plaintiff Vuitton for cybersquatting (cyberpiracy) under Federal Law, 15 U.S.C. § 1125(d)(1).

4. JUDGMENT IS HEREBY ENTERED in favor of Louis Vuitton Malletier and Oakley, Inc. against Defendants and against Christopher Veit, Hena Hasan a/k/a Hena Veit, individually and d/b/a Watch Replica, *watchreplica.com*, and *replicatime.com;* Swiss Click, Inc.; and Michael Kelvin a/k/a Richard Jones, Individually and d/b/a Netgifts and Net Gifts, Inc. jointly and severally, as follows:

Statutory Damages for Trademark
Infringement.......................$ 1,500,000

Statutory Damages for Cybersquatting ...$ 100,000

Attorneys' Fees and costs. ............$ 46,504.88.

Total Judgment hereby Entered: $ 1,646,504.88

5. This judgment shall accrue interest, compounded annually, pursuant to 28 U.S.C. § 1961.

6. Plaintiffs are entitled to a permanent injunction against Defendants from further infringing any of Plaintiffs' above mentioned trademarks. This Court contemporaneously issues a separate Permanent Injunction.